# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 20, 2018

No. 15-10311

Lyle W. Cayce
Clerk

FREDRIC RUSSELL MANCE, JR.; TRACEY AMBEAU HANSON;
ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP
AND BEAR ARMS,

        Plaintiffs–Appellees,

v.

JEFFERSON B. SESSIONS, III, U. S. ATTORNEY GENERAL; THOMAS E.
BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms and
Explosives,

        Defendants–Appellants.

Appeal from the United States District Court
for the Northern District of Texas

Before OWEN and HAYNES, Circuit Judges.[*]

PER CURIAM:

The petition for rehearing en banc has been denied. We withdraw the prior opinion that issued January 19, 2018, and substitute the following opinion.

---

[*] Judge Edward Prado, a member of the original panel in this case, retired from the court on April 2, 2018, and therefore did not participate in the revised opinion. The new opinion is issued by a quorum. *See* 28 U.S.C. § 46(d).

No. 15-10311

Federal laws that include 18 U.S.C. §§ 922(a)(3) and 922(b)(3), and 27 C.F.R. § 478.99(a), generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located.  In a suit brought by Fredric Russell Mance, Jr. and others, the federal district court enjoined the enforcement of these laws, concluding that they violate the Second Amendment and the Due Process Clause of the Fifth Amendment.[1]  We reverse the district court's judgment and vacate the injunction.

## I

Andrew and Tracy Hanson, who are residents of the District of Columbia and members of the Citizens Committee for the Right to Keep and Bear Arms (the Committee), travelled to Texas desiring to purchase two handguns from Mance, an FFL in Arlington, Texas, who is also a member of the Committee. It is undisputed that the Hansons would be eligible under the laws of Texas and the District of Columbia to own and possess the handguns that they selected from Mance's inventory.  However, federal law prevents Mance from selling a handgun directly to the Hansons since they are not residents of Texas. Federal law would have permitted Mance to transfer the handguns to the FFL in the District of Columbia so that the Hanson's could purchase the firearms from that FFL.  The federal laws do not impose or even allude to a fee if such a transfer occurs, but the FFL in the District of Columbia would have charged the Hansons a transfer fee of $125 for each handgun, above and beyond the purchase price.  The Hansons declined to pursue this method of obtaining the firearms because they objected to the additional fees and to shipping charges. They could not purchase the handguns of their choosing from the sole FFL in the District of Columbia because that dealer has no inventory and only sells

---

[1] *Mance v. Holder*, 74 F. Supp. 3d 795, 813-14 (N.D. Tex. 2015).

No. 15-10311

firearms transferred from FFLs outside of the District.

Mance, the Hansons, and the Committee initiated suit in Texas challenging the federal laws that restrict the sale of handguns by an FFL to residents of the state in which the FFL is located, asserting that the federal laws contravene the Second and Fifth Amendments. The plaintiffs sought an injunction prohibiting the enforcement of these laws. The district court denied the Government's Motion to Dismiss for Lack of Standing, granted the plaintiffs' motion for summary judgment, and denied the Government's competing motion for summary judgment. The district court enjoined the enforcement of the challenged laws, concluding that they violated both the Second Amendment and the equal protection component of the Fifth Amendment's Due Process Clause. The Government has appealed.

## II

Because the Hansons are not Texas residents, Mance, a Texas FFL, cannot lawfully sell handguns to them. Such a transaction is prohibited by 18 U.S.C. § 922(a)(3) and (b)(3), which provide:

> (a) It shall be unlawful— . . .
>
> (3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter . . . .

3

## No. 15-10311

\* \* \*

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver— . . .

(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes . . . .[2]

Regulations promulgated to implement these prohibitions are set forth in 27 C.F.R. § 478.99(a), which provides:

(a) Interstate sales or deliveries. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: *Provided*, That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c) are fully met, and (2) shall not apply to the loan or rental of a firearm to any person

---

[2] 18 U.S.C. § 922(a)(3), (b)(3).

4

No. 15-10311

for temporary use for lawful sporting purposes (see § 478.97).[3]

The question is whether these federal laws violate the Second Amendment.

## III

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[4] The United States Supreme Court held in *District of Columbia v. Heller* that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[5]

After extensive analysis of the historical context of the Second Amendment, the Court concluded in *Heller* "that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" to keep and bear arms[6] and concluded in *McDonald v. City of Chicago, Ill.* that "the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty."[7] The Court reasoned in *Heller* "that self-defense . . . was the *central component* of the right itself."[8] With regard to handguns, the Court observed that, "the American people have considered the handgun to be the quintessential self-defense weapon."[9] In contemplating why a citizen might prefer a handgun over long guns for home defense, the Court held, "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their

---

[3] 27 C.F.R. § 478.99.

[4] U.S. CONST. amend. II.

[5] 554 U.S. 570, 592 (2008).

[6] *Id.* (emphasis in original).

[7] 561 U.S. 742, 778 (2010) (plurality opinion).

[8] *Heller*, 554 U.S. at 599 (emphasis in original).

[9] *Id.* at 629.

5

No. 15-10311

use is invalid."[10]

The Supreme Court has recognized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."[11]  The Court explained in *Heller* that:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[12]

The Court added: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."[13]

In *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, our court was called upon to apply *Heller* in determining whether federal statutes[14] that prohibit FFLs from selling handguns to a person under the age of 21 were constitutional in light of the Second Amendment.[15]  We first canvased the analytical frameworks that other Circuit Courts of Appeals had utilized in Second Amendment cases, identified "[a] two-step inquiry" employed by some of those courts, and "adopt[ed] a version of this two-step approach."[16]  We concluded "that the first inquiry is

---

[10] *Id.*

[11] *Id.* at 626.

[12] *Id.* at 626-27; *see also McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." (citation omitted)).

[13] *Heller*, 554 U.S. at 627 n.26.

[14] 18 U.S.C. § 922(b)(1) and (c)(1).

[15] 700 F.3d 185, 192 (5th Cir. 2012).

[16] *Id.* at 194 (citing *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir.2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010);

6

whether the conduct at issue falls within the scope of the Second Amendment right."[17]  That undertaking, we said, entails "look[ing] to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee."[18]

The district court in the present case undertook such an analysis and determined that "the earliest known state residency restrictions on the purchase or possession of firearms" occurred in 1909.[19]  The district court concluded that "these early twentieth century state residency restrictions do not date back quite far enough to be considered longstanding."[20]  Because we conclude that the laws and regulations at issue withstand strict scrutiny, we will assume, without deciding, that they are not "longstanding regulatory measures"[21] and are not "presumptively lawful regulatory measures."[22]  We will also assume, without deciding, that the strict, rather than intermediate, standard of scrutiny is applicable.

Mance, who is a Texas FFL, and FFLs who are members of the Committee seek to sell handguns directly to residents in every state, provided that the purchaser is qualified under the laws of the state of residence to purchase and possess the handgun that would be sold.  The FFLs concede that the federal laws at issue are constitutional when applied to preclude, for example, juveniles, individuals convicted of certain crimes, and the mentally ill from purchasing a handgun from an out-of-state seller, but the extent to

---

*United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

[17] *Nat'l Rifle Assoc. of Am.*, 700 F.3d at 194.

[18] *Id.*

[19] *Mance v. Holder*, 74 F. Supp. 3d 795, 805 (N.D. Tex. 2015).

[20] *Id.*

[21] *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion).

[22] *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008).

which the FFLs have asserted a facial challenge to these laws is not entirely clear from their briefing in this court. We assume for purposes of our analysis, without deciding, that a facial challenge is presented.[23]

Mance and the Hansons additionally challenge the federal laws, as applied to the Hansons and similarly situated residents of the District of Columbia. We consider those contentions to be as-applied challenges.

**IV**

The Supreme Court has said in the First Amendment context that strict scrutiny "requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'"[24] When strict scrutiny is applicable, the Government "must specifically identify an 'actual problem' in need of solving,'" and the "curtailment of [the constitutional right] must be actually necessary to the solution."[25] Though this is "a demanding standard," and "'[i]t is rare that a regulation restricting speech because of its content will ever be permissible,'"[26] the Supreme Court has observed that "those cases do arise"[27] and has said that "we wish to dispel the

---

[23] *See generally City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) (explaining that "for facial challenges, a plaintiff must establish that a 'law is unconstitutional in all of its applications'"; that "when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct"; and that "'[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) and *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894 (1992)); *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

[24] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (quoting *Fed. Election Comm'n v. Wis. Right to Life Inc.*, 551 U.S. 449, 464 (2007)).

[25] *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 799 (2011) (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 822 (2000)).

[26] *Id.* (quoting *Playboy*, 529 U.S. at 818).

[27] *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015).

notion that strict scrutiny is 'strict in theory, but fatal in fact.'"[28]

The district court accepted that when Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968[29] (Crime Control Act) and the Gun Control Act of 1968[30] there was an actual problem in need of solving.[31] The findings and declarations set forth in the Crime Control Act reflect that Congress was of the view that "the existing Federal controls over [widespread traffic in firearms] do not adequately enable the States to control this traffic within their own borders through the exercise of their police power."[32] Congress had concluded that there was a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State," and these interstate purchases were accomplished "without the knowledge of . . . local authorities."[33] Congress found that individuals circumventing the laws of the state in which they resided included "large numbers of criminals and juveniles."[34] Congress had additionally concluded "that the acquisition on a mail-order basis of firearms other than a rifle or shotgun by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws

---

[28] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (MARSHALL, J., concurring in the judgment)).

[29] Pub. L. No. 90-351, 82 Stat. 197 (1968).

[30] Pub. L. No. 90-618, 82 Stat. 1213 (1968).

[31] *See Mance v. Holder*, 74 F. Supp. 3d 795, 808-09 (N.D. Tex. 2015). ("First, the Court agrees the Government's interest in preventing handgun crime is a compelling interest.").

[32] Crime Control Act § 901(a)(1), 82 Stat. at 225 (1968).

[33] S. REP. NO. 89-1866 (1966), at 19.

[34] S. REP. NO. 90-1097 (1968), at 80; *see also* Crime Control Act § 901(a)(2), 82 Stat. at 225 (1968) ("The Congress hereby finds and declares . . . that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States . . . .").

and regulations, and local ordinances . . . ."[35]  Similarly, Congress found:

> that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms . . . .[36]

The solution Congress crafted included the in-state sales requirement.

However, current burdens on constitutional rights "must be justified by current needs."[37]  The overarching question in a strict-scrutiny analysis of the laws and regulations at issue, it seems to us, is whether an in-state sales requirement remains justified by a compelling government interest and is narrowly tailored to serve that interest after the Gun Control Act was amended by the Brady Act[38] and in light of federal regulations promulgated after the in-state sales requirement was enacted.[39]  Presently, before an FFL may sell a handgun to a person who is not also an FFL, the FFL must contact the national instant criminal background check system (NICS) before proceeding with the transaction.[40]  An exception to this requirement is that if the law of a state provides that a permit to buy a handgun "is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person [*i.e.*, the potential buyer] would be in violation of law," then an FFL may rely on that state's permit in making the sale.[41]  States that have such laws are

---

[35] Crime Control Act § 901(a)(4), 82 Stat. at 225 (1968).

[36] *Id.* § 901(a)(5), 82 Stat. at 225 (1968).

[37] *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013) (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).

[38] Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

[39] *See* 27 C.F.R. § 478.24.

[40] 18 U.S.C. § 922(t).

[41] *Id.* § 922(t)(3).

No. 15-10311

called point-of-contact states. FFLs that are located within a point-of-contact state contact an agency or person designated by that state directly and do not contact the NICS to obtain background checks.

All parties to this suit concede that there is a compelling government interest in preventing circumvention of the handgun laws of various states. The plaintiffs recognize that current federal laws, including the Brady Act, do not require all information regarding compliance with the various state and local gun control laws to be included in the databases accessed when FFLs contact NICS requesting a background check. The states voluntarily provide records for use in the databases accessed by NICS. It is undisputed that, for various reasons, some records are not timely provided, or are not provided at all. The plaintiffs maintain, however, that the in-state sales requirement is not narrowly tailored because the states could be compelled by federal law to provide all necessary information. We conclude that the Government has demonstrated that the in-state sales requirement is narrowly tailored, notwithstanding the information that is available to all FFLs under federal laws and regulations.

There are more than 123,000 FFLs nationwide.[42] It is unrealistic to expect that each of them can become, and remain, knowledgeable about the handgun laws of the 50 states and the District of Columbia, and the local laws within the 50 states and the District. The district court relied on 27 C.F.R. § 478.24[43] to support the conclusion that FFLs can "ensure that their firearms

---

[42] U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL EVALUATION AND INSPECTIONS DIVISION, REVIEW OF ATF'S FEDERAL FIREARMS LICENSEE INSPECTION PROGRAM at i (2013), *available at* https://oig.justice.gov/reports/2013/e1305.pdf.

[43] The text of 27 C.F.R. § 478.24 provides:

     (a) The Director shall annually revise and furnish Federal firearms licensees with a compilation of State laws and published ordinances which are

11

transactions comport with state and local law."[44]  But the compilation of state gun laws by the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives is more than 500 pages long, and it provides the full text of those laws.[45]  FFLs are not engaged in the practice of law, and we do not expect even an attorney in one state to master the laws of 49 other states in a particular area.  Additionally, the compilation on which the district court relied is only updated annually.[46]

The laws of the various states differ as to who may lawfully possess a firearm.  All but one state (Vermont) prohibits possession of a firearm by a felon, but the definitions of "felony" differ.  Restrictions based on mental illness vary among the states.  Some states prohibit the purchase of a firearm by drug

---

relevant to the enforcement of this part.  The Director annually revises the compilation and publishes it as "State Laws and Published Ordinances—Firearms" which is furnished free of charge to licensees under this part.  Where the compilation has previously been furnished to licensees, the Director need only furnish amendments of the relevant laws and ordinances to such licensees.

(b) "State Laws and Published Ordinances—Firearms" is incorporated by reference in this part.  It is ATF Publication 5300.5, revised yearly.  The current edition is available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402.  It is also available for inspection at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.  This incorporation by reference was approved by the Director of the Federal Register.

[44] *Mance v. Holder*, 74 F. Supp. 3d 795, 810 n.11 (N.D. Tex. 2015).

[45] *See generally State Laws and Published Ordinances - Firearms* (32nd Edition), BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Nov. 22, 2017), https://www.atf.gov/firearms/state-laws-and-published-ordinances-firearms-32nd-edition [https://perma.cc/KNU2-FYHS] (last visited Nov. 29, 2017).

[46] *See* 27 C.F.R. § 478.24(a).

abusers,[47] and some restrict purchases by those who have abused alcohol.[48]

It is reasonable, however, for the federal government to expect that an FFL located in a state, and subject to state and local laws, can master and remain current on the firearm laws of that state. The in-state sales requirement is narrowly tailored to assure that an FFL who actually delivers a handgun to a buyer can reasonably be expected to know and comply with the laws of the state in which the delivery occurs.

The plaintiffs assert that federal law could require all FFLs to comply with the guns laws of the state in which a buyer of a handgun resides, just as federal law requires FFLs to comply with state and local laws throughout the United States when selling long arms.[49] They assert, "[i]f Mance can follow an out-of-state rifle law, he can follow an out-of-state handgun law."

However, at least some states have regulated the sale of handguns more extensively than they have regulated the sale of long guns. For example, the Government has identified state laws that require a mandatory waiting period for the purchase of handguns, but not for long guns,[50] and state laws that limit the number of handgun purchases, but not long gun purchases, to one per

---

[47] *See, e.g.*, MD. CODE ANN., PUB. SAFETY § 5-133(b)(5); MO. REV. STAT. § 571.070.

[48] *See, e.g.*, MD. CODE ANN., PUB. SAFETY § 5-133(b)(4); TENN. CODE ANN. § 39-17-1316.

[49] *See* 18 U.S.C. § 922(b)(3)(A) (providing that an FFL may sell or deliver "any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States) . . .").

[50] *See, e.g.*, FLA. CONST. art. I, § 8(b); FLA. STAT. § 790.0655; MD. CODE ANN., PUB. SAFETY §§ 5-101(p), (r), 5-123.

month.[51]

But there is another reason that the plaintiffs' reliance on the disparate treatment federal law accords handguns and long guns does not carry the day. In the First Amendment context, the Supreme Court has recognized in response to an "underinclusivity" argument that "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."[52]  The Court observed, "[w]e have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests."[53]  In *Williams-Yulee v. Florida Bar*, the Court held that a Florida statute prohibiting judges and judicial candidates from personally soliciting campaign funds[54] survived strict scrutiny even though Florida law permitted "a judge's campaign committee to solicit money, which arguably reduces public confidence in the integrity of the judiciary just as much as a judge's personal solicitation."[55]

The plaintiffs contend that the federal laws are not narrowly tailored because they could be drawn to permit a person to obtain a handgun from an out-of-state FFL if the purchaser is qualified under the laws of the state in which he or she lives to purchase and possess the desired make and model, and states could be compelled to inform the out-of-state FFL whether the purchaser was qualified.  The federal government cannot compel state law enforcement officials to provide, and timely update, information as to whether a particular

---

[51] *See, e.g.*, CAL. PENAL CODE §§ 27535, 27540(f); MD. CODE ANN., PUB. SAFETY §§ 5-128(b), 5-129; N.J. STAT. ANN. §§ 2C:58-2(a)(7), 2C:58-3(i), 2C:58-3.4. *But see Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015) (holding that law prohibiting registration of "more than one pistol" during any 30-day period violated the Second Amendment).

[52] *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1668 (2015).

[53] *Id.*

[54] *Id.* at 1663.

[55] *Id.* at 1668.

person is authorized under state and local laws to purchase and possess a particular handgun.[56]

The challenged federal gun laws allow ample access to handguns by those who are permitted to possess and purchase them under state and local laws. A qualified person in any state may purchase a handgun from an FFL in his or her state of residence, or may purchase the handgun from an out-of-state FFL as long as the weapon is lawfully transferred to an in-state FFL. The restrictions applicable to interstate transfers of handguns are the least restrictive means of insuring that the handgun laws of states are not circumvented.

The delay incurred if a handgun is purchased out of state and transferred to an in-state FFL is de minimis. In addition, even were a person permitted to purchase a handgun directly from an out-of-state FFL under federal law, some states' laws would result in delay. A few states prohibit a non-resident from possessing a handgun at all,[57] and others require a permit before possession of

---

[56] *See Printz v. United States*, 521 U.S. 898, 933-34 (1997) (holding that "the central obligation imposed upon [chief law enforcement officers] by the interim provisions of the Brady Act—the obligation to 'make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a handgun] would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General,' 18 U.S.C. § 922(s)(2)—is unconstitutional. Extinguished with it, of course, is the duty implicit in the background-check requirement that the [chief law enforcement officer] accept notice of the contents of, and a copy of, the completed Brady 934 Form, which the firearms dealer is required to provide to him, §§ 922(s)(1)(A)(i) (III) and (IV).").

[57] *See, e.g.*, CAL. PENAL CODE § 26845(a) ("No handgun may be delivered unless the purchaser . . . presents documentation indicating that the person is a California resident."); IOWA CODE ANN. § 724.15 (prohibiting the purchase of a pistol or revolver, subject to enumerated exceptions applicable to some non-residents, until the purchaser has obtained a permit, which shall issue only "to any resident of this state"); MASS. GEN. LAWS ANN. ch. 140, § 129C (prohibiting the possession of a firearm, subject to enumerated exceptions inapplicable to non-residents regarding handguns, until the possessor has obtained an identification card, which dunder § 129B is only obtainable by residents); MD. CODE ANN., PUB. SAFETY § 5-117.1 (requiring handgun qualification license for purchase of a handgun

a handgun is lawful.[58]  Unless a non-resident acquired the required permit before seeking to purchase a handgun in those states, some delay would most likely occur before delivery of a handgun would be permitted.  Accordingly, in a number of states, an out-of-state purchaser could not take delivery of a handgun from an FFL immediately, if at all.

The plaintiffs assert that, at a minimum, the in-state sales requirement cannot be applied to transactions like the one proposed between Mance and the Hansons.  They contend that the District of Columbia requires police pre-approval of any handgun transfer, citing D.C. Code § 7-2502.06(a), so that an FFL in another state would not have to become acquainted with District of Columbia laws because it could rely on a permit issued by police in the District

---

and limiting the issue of such licenses to state residents who meet certain qualifications); NEB. REV. STAT. ANN. § 69-2403 (prohibiting the purchase of a handgun, subject to enumerated exceptions, until the purchaser has obtained a certificate, which under § 69-2404 is only obtainable from the "sheriff of the applicant's place of residence").

[58] *See, e.g.*, CONN. GEN. STAT. § 29-28 (prohibiting FFLs from making retail sales of handguns to anyone without a state-issued permit to purchase, which cannot be acquired without a state-issued eligibility certificate or carry permit and documentation of compliance with local zoning requirements); D.C. CODE § 7-2502.06 ("An application for a registration certificate shall be . . . issued[] prior to taking possession of a firearm."); HAW. REV. STAT. § 134-2 ("No person shall acquire the ownership of a firearm . . . until the person has first procured . . . a permit to acquire the ownership of a firearm."); 430 ILL. COMP. STAT. 65/2 (requiring all persons to obtain an identification card from state police before acquiring or possessing any firearm with some exceptions, including non-residents who are licensed in their home state or keep their firearms unloaded and enclosed in a case); MICH. COMP. LAWS ANN. § 28.422 (requiring a license to possess, purchase, transfer or carry a handgun, with exceptions for non-residents who are licensed to purchase, carry or transport a handgun in their state of residence); N.J. STAT. ANN. § 2C:39-5(b)(1) ("Any person who knowingly has in his possession any handgun . . . without first having obtained a permit to carry the same . . . is guilty of a crime."); N.Y. PENAL LAW §§ 265.01, 265.20(a)(3), (13) (prohibiting the possession of a firearm subject to many exceptions including the issuance of a state license and non-resident travel to and from conventions and similar events); N.C. GEN. STAT. ANN. § 14-402 (prohibiting the purchase of a pistol unless either a license or permit is obtained under § 14-404—which is only available for non-residents if the "purpose of the permit is for collecting"—or a resident has a valid North Carolina concealed handgun permit); 11 R.I. GEN. LAWS § 11-47-35 (limiting sale of pistols and revolvers to persons who present a state-issued safety certificate, which requires approval by state police and completion of a state-approved safety course).

of Columbia. One obvious flaw in this argument is that an FFL outside the District of Columbia would have to ascertain that all that was required under the laws of the District was such a permit. Nor is there evidence that a means exists by which an out-of-state FFL can confirm in the District of Columbia that a handgun permit has in fact been issued by the Chief of Police of the District.

In the present case, the Hansons only completed a form promulgated by the Chief of Police of the District when they were in Texas, in the presence of Mance. There is no evidence that the Hansons or Mance submitted that form to the Chief of Police in the District, as required under the laws of the District, or that the Hansons were ever actually approved by the Chief of Police to purchase the handguns they had selected. They have not alleged or offered evidence that they presented an approved permit to Mance. In any event, permitting an out-of-state FFL to assume that a permit presented by a purchaser is what it purports to be, with no means of confirming the validity of the permit, would allow handguns to be purchased upon presentation of a forged or fraudulent permit.

The laws of the District of Columbia provide that no seller of a firearm in the District may deliver a firearm to a purchaser until ten days after the purchase.[59] Permitting an out-of-state FFL to consummate a sale to a resident of the District based solely on the presentation of a permit from the Chief of Police of the District would allow that resident to circumvent the ten-day waiting period.

The laws of the District expressly provide that sales of handguns to its residents may occur through transfers from out-of-District FFLs to an FFL

---

[59] D.C. CODE § 22-4508.

within the District.[60]  The evidence in the record reflects that the sole FFL authorized to sell handguns to the public in the District does not in fact sell handguns directly to purchasers but instead only facilitates sales through the transfer of handguns from out-of-state FFLs.  The plaintiffs have contended that this is a consequence of laws or regulations promulgated by the District.  In assessing the impact of the *federal* restrictions upon the Hansons and Mance, it must be recognized that it is the District's restrictions that have led the lone FFL in the District to sell only handguns that are transferred from an out-of-District FFL.  The fact that no handguns are available for direct purchase in the District is not a result of the in-state sales requirement or any other federal law or regulation.

We conclude that the in-state sales requirement is not unconstitutional as applied to Mance and the Hansons.  The Hansons are not prohibited by the federal laws from purchasing and possessing handguns, and the requirement that a handgun purchased from an FFL outside of the District be transferred to an FFL in the District to consummate the purchase is the least restrictive means of assuring that the Hansons and those similarly situated are authorized under the District's laws to purchase and possess the particular firearms that they seek to buy.

## V

The district court held that the in-state sales requirement violated the equal protection guarantee in the Due Process Clause of the Fifth Amendment.  The court reasoned that "the federal law not only creates a discriminatory regime based on residency, but it also involves access to the constitutional guarantee to keep and bear arms."[61]

---

[60] *See* D.C. Mun. Regs. Tit. 24, § 2320.3(b), (c), (d), (e), (f).
[61] *Mance v. Holder*, 74 F. Supp. 3d 795, 814 (N.D. Tex. 2015) (emphasis omitted).

No. 15-10311

To succeed on an equal protection claim under the Due Process Clause of the Fifth Amendment, a plaintiff is required to "show that two or more classifications of similarly situated persons [are] treated differently."[62]  If we determine that the classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class," we subject the classification to strict scrutiny.[63]  Otherwise, we will uphold the classification if it is "rationally related to a legitimate state interest."[64]

The in-state sales requirement does not discriminate based on residency.  So we do not subject it to any scrutiny—strict or otherwise—under the equal protection component of the Due Process Clause.  The cases on which the district court relied in concluding that the federal laws at issue "impinge[] on residency"[65] involved *state* laws that granted benefits to state residents.[66] The in-state sales requirement does not favor or disfavor residents of any particular state. Rather, it imposes the same restrictions on sellers and purchasers of firearms in each state and the District of Columbia.

\*    \*    \*

We REVERSE the district court's judgment and VACATE the order granting injunctive relief.

---

[62] *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam).

[63] *Nat'l Rifle Assoc. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 211-212 (5th Cir. 2012) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam)).

[64] *Id.* at 212.

[65] *Mance*, 74 F. Supp. 3d at 814.

[66] *See id.* (citing *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 899 (1986) (holding unconstitutional a preference in state civil service employment opportunities for veterans who were residents when they entered military service); *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 254-64 (1974) (holding unconstitutional a state law establishing in-state residency of a fixed duration as a prerequisite to receiving free, non-emergency medical care)).

No. 15-10311

PRISCILLA R. OWEN, Circuit Judge, concurring:

The concurring opinion issued January 19, 2018, is withdrawn and the following is substituted.

As an initial matter, the Second Amendment right is a fundamental one. The Supreme Court recognized in *McDonald v. City of Chicago*, citing its decision in *District of Columbia v. Heller*, that "[t]he right to keep and bear arms was considered . . . fundamental by those who drafted and ratified the Bill of Rights," explaining that "[d]uring the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric."[1]  The *Heller* opinion recounts that "[i]t was understood across the political spectrum that the right [to keep and bear arms] helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down."[2]  It was "therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia."[3]

However, "[t]he prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting."[4] "But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution."[5]  In *McDonald*, the Court explained that "[b]y the 1850's, the perceived threat that had

---

[1] 561 U.S. 742, 768 (2010) (quoting 554 U.S. 570, 598 (2008)).
[2] *Heller*, 554 U.S. at 599.
[3] *Id.*
[4] *Id.*
[5] *Id.*

prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense."[6]  The question is whether the federal laws at issue violate this fundamental right.

## I

Our court is not the first to hold that the Second Amendment does not require us to strike down the federal laws governing the interstate sales of handguns.  The Second Circuit held that 18 U.S.C. § 922(a)(3) did not violate the Second Amendment rights of a person convicted for transporting into his state of residence a firearm acquired in another state in violation of § 922(a)(3).[7]  That court reasoned that "[b]ecause § 922(a)(3) only minimally affects the ability to acquire a firearm, it is not subject to any form of heightened scrutiny."[8]  The Second Circuit reasoned that a "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense."[9]  Adequate alternative means remain, the court concluded, because the law "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything," and the law "does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the

---

[6] *McDonald*, 561 U.S. at 770.

[7] *United States v. Decastro*, 682 F.3d 160, 161 (2d Cir. 2012).

[8] *Id.* at 164; *see also id.* at 168 (citing *Nordyke v. King*, 644 F.3d 776, 786 (9th Cir. 2011), *aff'd* 681 F.3d 1041 (9th Cir. 2012) (en banc); *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 94-95 (3d Cir. 2010)).

[9] *Id.* at 168.

purchaser's home state."[10]   The Eleventh Circuit has held that § 922(a)(5), which prohibits the transfer of a firearm by an unlicensed person to another unlicensed person who resides in a different state, "qualifies as the kind of 'presumptively lawful regulatory measure[]' described in *Heller*."[11]

## II

The Government contends that the laws and regulations under consideration are "presumptively lawful" because they are "longstanding prohibitions" that impose "conditions and qualifications on the commercial sale of arms," within the contemplation of the Supreme Court's decision in *District of Columbia v. Heller*.[12]   This argument is not well-taken.

The Government asserts that between 1909 and 1939, at least fifteen states had enacted laws restricting the acquisition, or carrying of one or more types of firearms to state residents.[13]   The Government contends that evidence of "founding-era thinking" is not required.   This court said in *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives* (*NRA*), that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."[14]   In that case, our court nevertheless extensively considered founding-era "[a]ttitudes" regarding gun laws and regulations.[15]   This court observed in *NRA* that "[s]cholars have proposed that at the time of the founding," there was an implication that only "the virtuous citizen" had the right to possess and use arms and that criminals,

---

[10] *Id.*

[11] *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 & n.26 (2008)).

[12] *See* 554 U.S. at 626-27, 627 n.26.

[13] *See infra* note 26.

[14] 700 F.3d 185, 196 (5th Cir. 2012).

[15] *Id.* at 200-02.

children and the mentally ill were "deemed incapable of virtue,"[16] which was relevant to whether the federal law at issue in that case, prohibiting the sale of a handgun to someone under the age of 21, was constitutional.

More importantly, in *Heller*, the Supreme Court exhaustively canvassed laws extant at the time of, and predating, the Bill of Rights in determining the meaning of the Second Amendment,[17] though it also considered pre-Civil War commentators and case law,[18] post-Civil War legislation,[19] post-Civil War commentators,[20] and engaged in a limited analysis of some of the restrictions recognized in an era spanning from "Blackstone through the 19th Century."[21] The Government asserts that in *Heller*, the Supreme Court described "prohibitions on the possession of firearms by felons" as "longstanding prohibitions" that are "presumptively lawful,"[22] though the D.C. Circuit subsequently concluded that "states did not start to enact [prohibitions on the possession of firearms by felons to which the Supreme Court referred in *Heller*] until the early 20th century."[23] But, as this court recognized in *NRA*, there are indications that in the founding era, it was generally thought that felons and the mentally ill should and could be prohibited from bearing arms.[24]

In the present case, the Government has offered no evidence that an in-state sales requirement has a founding-era analogue or was historically

---

[16] *Id.* at 201 (quoting Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1359-60 (2009)).

[17] *Heller*, 554 U.S. at 580-605.

[18] *Id.* at 605-14.

[19] *Id.* at 614-16.

[20] *Id.* at 616-19.

[21] *Id.* at 626-28; *see also id.* at 626 (citing THE AMERICAN STUDENTS' BLACKSTONE 84 n. 11 (G. Chase ed. 1884)).

[22] *Id.* at 626-27, 627 n.26.

[23] *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011).

[24] *Nat'l Rifle Assoc. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200-202 (5th Cir. 2012).

understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified.  However, even if it is appropriate to consider only 20th century laws, an in-state sales requirement was not a "historical tradition"[25] or commonly found in the laws of the United States in that era.

The Government has identified sixteen statutes in fifteen states dating from the early 20th century regarding the licensing or permitting of firearms or the carrying of concealed firearms.[26]  But none of these laws prohibited a citizen of a state from purchasing a firearm, or a specific type of firearm, in another state.  The only state law cited by the Government that addresses the purchase of a firearm in another state is a 1918 Montana statute that prohibits the purchase, borrowing, or other acquisition of a firearm outside of that state without first obtaining a permit in the county of the purchaser's or acquirer's residence.[27]  Even that state law permitted a resident to purchase a firearm,

---

[25] *Heller*, 554 U.S. at 627.

[26] Act of Apr. 6, 1936, No. 82, §§ 1, 5, 7, 1936 ALA. LAWS 51, 51-52, *amended by* Act of Mar. 2, 1937, No. 190, § 1, 1937 ALA. LAWS 223, 223 (Alabama in 1937); Act of March 19, 1923 §§ 1, 3, 1923 ARK. ACTS 379, 379-80 (Arkansas in 1923); Act of Aug. 12, 1910, No. 432, 1910 GA. LAWS 134 (Georgia in 1910); Act of July 11, 1919, § 4, 1919 ILL. LAWS 431, 432 (Illinois in 1919); Act of Feb. 21, 1935, ch. 63, §§ 1, 3, 5, 1935 IND. LAWS 159, 159-61 (Indiana in 1935); Act of Feb. 25, 1939, ch. 14, 1939 ME. ACTS 53 (Maine in 1939); Act of May 29, 1922, ch. 485, § 9, 1922 MASS. ACTS 560, 563 (Massachusetts in 1922); Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 MICH. ACTS 887, 887-89 (Michigan in 1927); Act of April 7, 1921, § 2, 1921 MO. LAWS 692 (Missouri in 1921); Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 MONT. LAWS 6, 6-9 (Montana in 1918); Act of March 3, 1919, ch. 74, § 5, 1919 MONT. ACTS 147, 148 (Montana in 1919); Act of March 11, 1924, ch. 137, §§ 1-2, 1924 N.J. ACTS 305, 305-06 (New Jersey in 1924); Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. LAWS 1627, 1628-29 (New York in 1913); Act of March 10, 1919, ch. 197, §§ 1-2, 1919 N.C. LAWS 397, 397-98 (North Carolina in 1919); Act of Feb. 26, 1913, ch. 256, § 1, 1913 OR. LAWS 497 (Oregon in 1913); Act of May 2, 1910, ch. 591, § 1, 1910 R.I. ACTS 156, 156-57 (Rhode Island in 1910); Act of Feb. 16, 1909, ch. 51, 1909 W. VA. ACTS 394, 395-96 (West Virginia in 1909).

[27] *See* Act of Feb. 20, 1918, ch. 2, § 3, 1918 MONT. LAWS at 6-9.

including a handgun, in another state.

We acknowledged in *NRA* that courts "may rely on a wide array of interpretive materials to conduct a historical analysis,"[28] but in the present case, the Government has offered no evidence from interpretive materials that an in-state sales requirement was considered lawful under the Second Amendment as that amendment has historically been understood. In the absence of such authority, the in-state sales requirement is not among the "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms"[29] that presumptively do not violate the Second Amendment.

## III

There is binding precedent in our circuit regarding the analysis to be undertaken in Second Amendment cases. In *NRA*, our court identified "[a] two-step inquiry" employed by other courts and "adopt[ed] a version of this two-step approach."[30] We concluded "that the first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right."[31] "If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny."[32] Some have expressed the view, however, that the latter inquiry is contrary to the Supreme Court's decisions in *Heller*[33] and *McDonald*,[34] reasoning that a

---

[28] *Nat'l Rifle Assoc. of Am.*, 700 F.3d at 194.

[29] *Heller*, 554 U.S. at 626-27.

[30] 700 F.3d at 194 (citing *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010) *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

[31] *Nat'l Rifle Assoc. of Am.*, 700 F.3d at 194.

[32] *Id.* at 195.

[33] 554 U.S. 570 (2008).

[34] 561 U.S. 742 (2010).

balancing test is inappropriate.[35]  We have applied our court's precedent.

I submit that whether the in-state sales requirement has a rational basis is not the correct standard by which to measure its constitutionality.  The Supreme Court made clear in *Heller* that rational-basis scrutiny is inappropriate when evaluating the constitutionality of laws that impose conditions or qualifications on the right to keep and bear arms.[36]  The Court reasoned that "rational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws."[37]  The Court concluded that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."[38]  The *Heller* decision recognized that the regulation at issue was a "handgun ban [that] amounts to a prohibition of an entire class of 'arms,'"[39] and that the law "fail[ed] constitutional muster" under both the strict and intermediate

---

[35] *See*, *e.g.*, *Heller*, 670 F.3d at 1271 (KAVANAUGH, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny. To be sure, the Court never said something as succinct as 'Courts should not apply strict or intermediate scrutiny but should instead look to text, history, and tradition to define the scope of the right and assess gun bans and regulations.' But that is the clear message I take away from the Court's holdings and reasoning in the two cases."); *Nat'l Rifle Assoc., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 339 (5th Cir. 2013) (JONES, J., dissenting from denial of reh'g en banc) ("[A]s *Heller* requires, we should presuppose that the fundamental right to keep and bear arms is not itself subject to interest balancing.  The right categorically exists, subject to such limitations as were present at the time of the Amendment's ratification.").

[36] *Heller*, 554 U.S. at 628 n.27.

[37] *Id.*

[38] *Id.*

[39] *Id.* at 628.

standards of scrutiny.[40]

The Government contends that intermediate scrutiny, rather than strict scrutiny, applies in analyzing the in-state sales requirement because, unlike the regulation at issue in *Heller*, it is not a "ban" on the sale of handguns.[41]  In *NRA*, we "reject[ed] the contention that every regulation impinging upon the Second Amendment right must trigger strict scrutiny" and held that the "properly tuned level of scrutiny . . . is [that which is] proportionate to the severity of the burden."[42]  We also suggested that "a regulation that does not encroach on the core of the Second Amendment" may be subject only to intermediate scrutiny.[43]  Conceivably, a restriction on the commercial sale of a handgun could impinge on the right to possess and bear arms to such an extent that, though not an absolute "ban" on the possession or use of a handgun, strict scrutiny would be applicable.  The Government is correct that the in-state sales requirement is not a total prohibition on handgun possession and use.  The in-state sales requirement does not prohibit residents of the District of Columbia from purchasing a handgun in the District or a resident of a state from buying a handgun in that state.

In assessing the impact of the federal restrictions upon the Hansons and Mance, it must be recognized that it is the *District's* restrictions that have led the lone FFL in the District to sell only handguns that are transferred from an FFL in one of the states.  The fact that no handguns are available for direct

---

[40] *Id.* at 628-29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' . . . would fail constitutional muster." (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007))).

[41] *Id.* at 628.

[42] *Nat'l Rifle Assoc. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 198 (5th Cir. 2012).

[43] *Id.* at 195.

purchase in the District is not a result of the in-state sales requirement or any other federal law or regulation. Nor do the federal laws set or require the imposition of a transfer fee by an FFL.

The in-state sales requirement does not prevent a resident of a state or the District of Columbia from using a handgun "in defense of hearth and home."[44] Once lawfully acquired, a handgun may be used and possessed as a defensive weapon where the owner of the handgun resides.

Nevertheless, because the Supreme Court held that the law at issue in *Heller* was unconstitutional under both strict and intermediate scrutiny, it is prudent first to apply strict scrutiny to the in-state sales requirement. Since the quorum concludes that the in-state sales requirement satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*.

**IV**

The plaintiffs assert that the in-state sales requirement is not narrowly tailored because an exception could readily be made for those states that elect to become a point of contact for background checks. Presently, in a point-of-contact state, a state actor or agency conducts the background check at the request of an in-state FFL, and the FFL is not required to contact the NICS.[45] At least twelve states have elected to become point of contact states.[46] The FFLs contend that if a potential buyer lives in a point-of-contact state and wishes to purchase a handgun from an out-of-state FFL, that FFL should be

---

[44] *Heller*, 554 U.S. at 635.

[45] 28 C.F.R. § 25.6(d).

[46] *See* CAL. PENAL CODE § 28220; COLO. REV. STAT. § 24-33.5-424(2); CONN. GEN. STAT. § 29-36l(d)(1); HAW. REV. STAT. § 134-2; 430 ILL. COMP. STAT. 65/3.1; NEV. REV. STAT. ANN. § 202.254(3)(a); N.J. ADMIN. CODE §§ 13:54-3.12, 13:54-3.13(a)(6); OR. REV. STAT. §§ 166.412(2)(d), 166.432(1); 18 PA. CONS. STAT. ANN. §§ 6111, 6111.1; TENN. CODE ANN. §§ 38-6-109, 39-17-1316; UTAH CODE ANN. § 76-10-526(3)(a); VA. CODE ANN. § 18.2-308.2:2.

permitted under federal law to request a background check through the point-of-contact state, and consummate the sale if the point-of-contact state of residence approves the buyer. However, this would not necessarily prevent circumvention of a point-of-contact state's firearms laws. It would not alleviate the need for the out-of-state FFL to master the laws of each point-of-contact-state into which it desired to sell handguns and to comply with them.

For example, California is a point-of-contact state, and the point of contact for background checks is the California Department of Justice (DOJ).[47] If a Texas FFL desired to sell a handgun to a California resident, and the California DOJ issued a handgun permit to that resident, then the Texas FFL would still have to ascertain and comply with other California laws. These include laws that: prohibit delivery of a handgun unless the purchaser presents documentation indicating that he or she is a California resident (the documentation includes "a utility bill from within the last three months, a residential lease, a property deed, or military permanent duty station orders indicating assignment within" California);[48] prohibit delivery of a handgun until a 10-day waiting period has expired;[49] require the handgun to be unloaded and securely wrapped or in a locked container at the time of delivery;[50] prohibit delivery unless a handgun safety certificate is presented;[51] and impose specific record-keeping requirements.[52] California law prohibits a

---

[47] CAL. PENAL CODE § 28205.

[48] *Id.* § 26845.

[49] *Id.* §§ 26815(a); 27540(a).

[50] *Id.* §§ 26815(b); 27540(b).

[51] *Id.* §§ 26840(a); 27540(e).

[52] *Id.* § 26840 (requiring a firearms dealer to retain a photocopy of the unexpired handgun safety certificate presented by the buyer); § 26845(c) (requiring retention of a photocopy of the documentation presented as proof of compliance with the California residency requirement); § 26900 (making certain records available for inspection); § 28215 (requiring the firearms dealer to: have the purchaser and salesperson sign the record of electronic or telephonic transfer; retain the original of each such record in consecutive order;

## No. 15-10311

dealer from delivering a handgun "unless the recipient performs a safe handling demonstration with that handgun,"[53] and the dealer must give instruction as to "how to render that handgun safe in the event of a jam."[54] The specific safe-handling demonstrations required are set forth by law; they differ, depending on the type of handgun;[55] and the firearms dealer must sign and date an affidavit stating that the requirements have been satisfied and obtain the purchaser's signature on the affidavit.[56]  A firearms licensee is required by California law to "post conspicuously within the licensed premises a detailed list" of fees and charges required by government agencies for processing firearms transfers and license charges.[57]  Effective January 1, 2018, California law directs firearms dealers to require agents and employees who handle, sell, or deliver firearms to obtain a certificate of eligibility from the California DOJ that he or she is not prohibited by state or federal law from possessing a firearm.[58]

### V

The district court's reasoning is thoughtful, and it is correct in many respects.  The district court correctly recognized that "[t]he principal purpose in enacting the 1968 Gun Control Act was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them,'"[59] and that

---

retain each such record for at least three years; permit inspection of the permanent record of the transaction by specified regulators; transmit the record of application, on the date of the application to purchase, to the California DOJ).

[53] *Id.* § 26850(a).

[54] *Id.* § 26850(c).

[55] *See id.* § 26850; § 26853 (semiautomatic pistol); § 26856 (double-action revolver); § 26859 (single-action revolver).

[56] *Id.* § 26850(d).

[57] *Id.* § 26875.

[58] *Id.* § 26915.

[59] *Mance v. Holder*, 74 F. Supp. 3d 795, 809 (N.D. Tex. 2015) (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).

"Congress intended to accomplish this" by precluding the crossing of a state line to purchase a handgun.[60] The district court recognized that in 1968, "an instant electronic background check system did not exist," but that the Gun Control Act was subsequently amended by the Brady Act.[61] The district court found that as a result, "before an FFL may sell or deliver a firearm to a non-FFL, he must complete a criminal background check through the National Instant Criminal Background Check System ('NICS') to ensure the purchaser is legally entitled to obtain and possess the firearm"[62] and that "States may also create a Point of Contact ('POC'), who acts as a liaison to NICS, to run the background check and receive notice of anticipated firearms purchases by its citizens."[63]

The district court concluded that this system "ensures potential purchasers can legally acquire and possess a firearm under state and federal law, and those states that desire to receive notice of firearms purchased by its citizens simply establish a POC,"[64] and that these checks "identify both federal and state disabilities" in would-be purchasers.[65] This conclusion is not entirely supported by the record.

The Government presented evidence that the federal background check system does not reflect whether a person seeking to purchase a handgun has satisfied state requirements that may include training and special permits and does not reflect whether a particular type of firearm is legal in a particular state. The Government also noted that states may require additional

---

[60] *Id.*

[61] *Id.* (citing Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993)).

[62] *Id.* (citing 18 U.S.C. § 922(t)).

[63] *Id.*

[64] *Id.*

[65] *Id.* at 810 (citing 18 U.S.C. § 922(t)).

procedures and a mandatory waiting period before a transaction may occur and that this information regarding a particular individual is not available in the databases.

But not all of the Government's arguments are well-taken. In contending that in-state background checks are superior to those conducted by FFLs in other states because the federal background check database may not include all information available to a state, the Government asserts that "states may face logistical and budgetary constraints in submitting information, and they may have privacy laws that prevent sharing of certain records," such as mental health records, and alcohol and drug use information. The Government has not explained how or why a state would be able to provide information such as mental health information for purposes of a transfer of a handgun by an in-state FFL but could not provide that information to an out-of-state FFL. Nevertheless, for the reasons set forth in the quorum's opinion, the in-state sales requirement withstands strict scrutiny.

## VI

The Government adduced evidence that addresses, in part, the disparate treatment of handguns and long guns under federal laws. When Congress enacted the in-state sales requirement in 1968, statistics reflected that "handguns were used in 70 percent of the murders committed with firearms,"[66] and that handguns were used in 78 percent of the firearm-related homicides of police officers killed in the line of duty.[67] The Government also presented evidence that, according to FBI statistics, handguns were the type of weapon

---

[66] S. REP. NO. 89-1866, at 5 (1966).

[67] *See Fed. Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the Judiciary*, 90th Cong. 899 (1968).

No. 15-10311

involved in at least 70 percent of firearm homicides from 2009 to 2013,[68] and that handguns were used in 73 percent of firearms-related felony homicides of law enforcement officials killed in the line of duty from 2004 to 2013.[69] This reflects that the type of firearm predominantly used in these crimes was a handgun, not a shotgun or rifle, and that the federal government has a compelling interest in addressing the type of weapon most frequently used to commit crimes and in seeking to ensure that state laws regulating the possession and use of that type of weapon are effective.

---

[68] *See* CRIM. JUSTICE INFO. SERVS. DIV., FBI, CRIME IN THE UNITED STATES 2013: EXPANDED HOMICIDE DATA, tbl. 8, https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_8_murder_victims_by_weapon_2009-2013.xls [https://perma.cc/S7MA-VH8H] (last visited Nov. 29, 2017).

[69] *See* CRIM. JUSTICE INFO. SERVS. DIV., FBI, 2013 LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED, tbl. 27, https://ucr.fbi.gov/leoka/2013/tables/table_27_leos_fk_type_of_weapon_2004-2013.xls [https://perma.cc/8V2C-FPZ7] (last visited Nov. 29, 2017).