## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-10197

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

     Plaintiff - Appellee

v.

ERIC GERARD MCGINNIS,

     Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, JONES, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

We again confront a Second Amendment challenge to a federal law prohibiting individuals subject to certain domestic violence protective orders from possessing firearms or ammunition for any purpose. 18 U.S.C. § 922(g)(8). Appellant Eric McGinnis, convicted by a jury of violating § 922(g)(8), claims the statute is a facially unconstitutional restriction on his right to keep and bear arms. This court rejected a virtually identical challenge two decades ago in Judge Garwood's landmark decision in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). Much has changed in Second Amendment jurisprudence

1

No. 19-10197

since then, and so we consider whether § 922(g)(8) still passes muster under our contemporary framework. It does.

Separately, McGinnis argues his conviction should be vacated because his protective order does not track the requirements of § 922(g)(8). He also asserts the district court abused its discretion by imposing a written special condition of supervised release not orally pronounced at sentencing. We affirm the conviction but remand for the limited purpose of conforming McGinnis's written judgment to the district court's oral pronouncement.

I.

On the evening of July 28, 2017, Grand Prairie Police Department (GPPD) officers were dispatched to a wooded area upon report of a potentially suicidal subject. While searching for the subject, they heard three gunshots nearby. Hurrying toward the source of the shots, the officers spotted a dark SUV parked near the tree line. As they prepared to approach the vehicle, a man later identified as McGinnis emerged from the woods.

McGinnis's presence ended up being unrelated to the suicide call. When questioned, however, McGinnis stated he had a gun in his backpack. McGinnis ignored commands to walk backward toward the officers, instead walking forward while claiming to be a CIA agent and asking the officers if it was illegal to shoot a gun in Texas. The officers placed McGinnis under arrest and searched his backpack, where they found a short-barrel AR-15 rifle with a collapsible stock and 3D-printed lower receiver, along with five thirty-round magazines. The backpack also held several envelopes containing documents entitled "9/11/2001 list of American Terrorist" (sic). The list included the names and addresses of several prominent politicians.

Upon running McGinnis's driver's license through law enforcement databases, the officers learned he was the subject of an active domestic protective order. The order had been issued by a Dallas County court on August

31, 2015, following a hearing at which Sherry Thrash, McGinnis's former girlfriend, testified that McGinnis had physically assaulted her on two occasions, injuring her wrists, ribs, and face. McGinnis was present and participated in the hearing. At its conclusion, the judge issued a protective order that prohibited McGinnis from, among other things, "[c]ommitting family violence against" Thrash or "[e]ngaging in conduct . . . reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" Thrash or a member of her family or household. The order included a finding "that family violence has occurred and that family violence is likely to occur in the foreseeable future." It also prohibited McGinnis from possessing a firearm and separately warned him that doing so would violate 18 U.S.C. § 922(g)(8). The protective order was to stay in effect for two years, meaning that it remained active at the time of McGinnis's 2017 arrest.

Further investigation revealed McGinnis had attempted to purchase a lower receiver from a retailer in June 2016. He answered "no" to the background check question that asked whether he was subject to any "court order restraining [him] from harassing, stalking, or threatening . . . an intimate partner." The Bureau of Alcohol, Tobacco, Firearms and Explosives agent who reviewed the form caught the lie and contacted McGinnis by phone in July 2016 to inform him that he could not legally purchase the receiver. The agent also sent McGinnis a letter via certified mail explaining that McGinnis could not lawfully own a firearm or ammunition because of the active protective order. At some point after this incident, McGinnis created his own receiver using a 3D printer.

Following McGinnis's 2017 encounter with the GPPD, he was charged in state court with illegally discharging a firearm within city limits and violating a protective order. Shortly thereafter, a federal grand jury indicted him on two additional charges. The first count charged McGinnis with illegally possessing

No. 19-10197

an unregistered short-barrel rifle.[1] The second count—and the only one at issue in this appeal—was for possession of ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(8). McGinnis pleaded not guilty and proceeded to trial, where a jury convicted him on both counts. The district court denied McGinnis's post-verdict Rule 29 motion for a judgment of acquittal, rejecting the constitutional and sufficiency challenges he raises again here. The court then sentenced McGinnis to 96 months imprisonment.[2] This appeal followed.

II.

McGinnis advances three arguments on appeal. First, he maintains that § 922(g)(8) is unconstitutional on its face. Second, he claims the protective order to which he was subject cannot support a conviction under § 922(g)(8) because the order's language fails to satisfy the statute's requirements. Third, he argues the special condition of supervised released barring him from "places frequented by Ms. Sherry Thrash" conflicts with the district court's oral pronouncement at sentencing. We consider each argument in turn.

A.

We begin with McGinnis's argument that § 922(g)(8) is a facially unconstitutional restriction on his Second Amendment right to keep and bear arms. "We review *de novo* the constitutionality of federal statutes." *United States v. Portillo–Munoz*, 643 F.3d 437, 439 (5th Cir. 2011). To sustain a facial challenge, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "Facial challenges to the constitutionality of statutes should

---

[1] *See* 26 U.S.C. §§ 5841 & 5861(d).

[2] McGinnis's sentence is well above his Guidelines range of 33 to 41 months. The district court varied upward out of regard for the "extremely serious" nature of his crimes, the multiple prior warnings he had received about his prohibited-person status, and the "danger [he posed] to the community."

4

No. 19-10197

be granted sparingly and only as a last resort." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) (quoting *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008)). Applying our contemporary framework for evaluating federal firearms regulations, we reaffirm our holding from *Emerson* that § 922(g)(8) is not facially unconstitutional.

1.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Our court explored the text, structure, and history of the Second Amendment nearly twenty years ago, becoming the first court of appeals to recognize that "the Second Amendment protects the right of *individuals* to privately keep and bear their own firearms that are suitable as individual, personal weapons . . . regardless of whether the particular individual is then actually a member of a militia." *Emerson*, 270 F.3d at 264 (emphasis added). Even so, we recognized that the Second Amendment's protection for individual rights "does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id.* at 261. Indeed, in *Emerson* we upheld the exact provision at issue here—18 U.S.C. § 922(g)(8)—as just such a restriction. *Id.* at 264.

Several years later, the Supreme Court similarly concluded that the Second Amendment codified a pre-existing "*individual* right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added) (striking down a D.C. ordinance banning handgun possession in the home). After conducting exhaustive textual and historical analyses much like those Judge Garwood undertook in *Emerson*, the

majority held the Second Amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Court repeatedly noted that the protection afforded by the individual right is at its zenith in the home, "where the need for defense of self, family, and property is most acute." *Id.* at 628. However, *Heller* also cautioned that the individual Second Amendment right is subject to important limitations including, for instance, "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626.

*Heller* "did not set forth an analytical framework with which to evaluate firearms regulations in future cases." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives* [*NRA*], 700 F.3d 185, 194 (5th Cir. 2012). Instead, the Supreme Court stated only that the ordinance at issue would fail "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller*, 554 U.S. at 628. Post-*Heller*, we— like our sister circuits—have "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016).[3] First, we ask "whether the conduct at issue falls within the scope of the Second Amendment right." *NRA*, 700 F.3d at 194. To make that determination, "we look to whether the law harmonizes with the historical

---

[3] McGinnis urges us to jettison this two-step inquiry in favor of the "historical-traditional analysis described by then-Judge Kavanaugh in his impressive dissent in *Heller II*." *See Heller v. Dist. Of Columbia* [*Heller II*], 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). Seven members of our court recently expressed support for an approach of that nature. *See Mance v. Sessions*, 896 F.3d 390, 394–95 (5th Cir. 2018) (Elrod, J., dissenting from denial of en banc rehearing). In *NRA*, however, a panel of our court adopted the two-step inquiry and we are therefore not at liberty to apply a different standard. *See Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (per curiam) ("Under our rule of orderliness, one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." (cleaned up)).

traditions associated with the Second Amendment guarantee." *Id.* If the burdened conduct falls outside the scope of the Second Amendment, then the law is constitutional and the inquiry is over. Otherwise, we proceed to step two, where we must determine and "apply the appropriate level of means-ends scrutiny"—either strict or intermediate. *Id.* at 195. "[T]he appropriate level of scrutiny 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the [individual Second Amendment] right.'" *Id.* (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). Under this framework, a "regulation that threatens a right at the core of the Second Amendment"—i.e., the right to possess a firearm for self-defense in the home—"triggers strict scrutiny," while "a regulation that does not encroach on the core of the Second Amendment" is evaluated under intermediate scrutiny. *Id.* Strict scrutiny "requires that the challenged statute be narrowly drawn to provide the least restrictive means of furthering a compelling state interest." *Dart v. Brown*, 717 F.2d 1491, 1498 (5th Cir. 1983). Intermediate scrutiny requires the lesser showing of "a reasonable fit between the challenged regulation and an important government objective." *NRA*, 700 F.3d at 195 (cleaned up).

2.

The statute at issue in this appeal, 18 U.S.C. § 922(g)(8), prohibits individuals subject to certain domestic protective orders from "possess[ing] in or affecting commerce, any firearm or ammunition." To convict a defendant under § 922(g)(8), the Government must establish that the protective order:

> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

18 U.S.C. § 922(g)(8)(A)–(C).

At the first step of the *NRA* inquiry, McGinnis argues that § 922(g)(8) burdens the Second Amendment right by "criminaliz[ing] the possession of any firearm or ammunition," including the possession of weapons in the home for self-defense. As to the second step, McGinnis urges us to apply strict rather than intermediate scrutiny because "a blanket disarmament, for any length of time, goes to the core of the Second Amendment." Moreover, he maintains that even under intermediate scrutiny the statute must fail because it is "not reasonably adapted to reducing domestic gun abuse." McGinnis candidly acknowledges the absence of case law support for his position, but urges this court to "blaze its own trail" in hopes we will "be the court vindicated by the Supreme Court."

As an initial matter, we must consider whether McGinnis's claim is foreclosed by circuit precedent. As discussed above, the 2001 decision in which our court articulated an individual-rights theory of the Second Amendment, *Emerson*, involved facial and as-applied challenges to the precise law at issue here: § 922(g)(8). *See Emerson*, 270 F.3d at 210, 212. Like McGinnis, Timothy Emerson was found in possession of a firearm while subject to a domestic protective order issued by a Texas state court, although in Dr. Emerson's case the protective order lacked any express finding he posed a future danger to his intimate partner. *Id.* at 211. After setting forth our subsequently-vindicated individual-rights interpretation, we nevertheless held that "section 922(g)(8), as applied to Emerson, does not infringe his individual rights under the Second Amendment." *Id.* at 260. Although we were "concerned with the lack of express

findings in the order, and with the absence of any requirement for the same in clause (C)(ii) of section 922(g)(8)," we nevertheless rejected Emerson's constitutional challenge. *Id.* at 261. We reasoned that because protective orders like the one at issue could be set aside by the issuing court or subject to review by an appellate court, "the nexus between firearm possession by the party so enjoined and the threat of lawless violence, is sufficient, though likely barely so, to support the deprivation, while the order remains in effect, of the enjoined party's Second Amendment right to keep and bear arms." *Id.* at 264.

McGinnis contends we are not bound by *Emerson* because the Supreme Court's subsequent *Heller* decision "effectively hit the reset button for all Second Amendment jurisprudence." We are not so sure. McGinnis does not identify, nor are we aware of, any holding or principle in *Heller* that casts doubt on *Emerson*. To the contrary, Justice Breyer's dissent in *Heller* cited *Emerson* as the lone example of a circuit court holding the Second Amendment protects the right to possess firearms for private, civilian purposes. *Heller*, 554 U.S. at 638 n.2 (2008) (Breyer, J., dissenting). Indeed, in *United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009), we explicitly held that a constitutional challenge to § 922(g)(1)—the federal statute barring convicted felons from possessing firearms—was foreclosed by our pre-*Heller* but post-*Emerson* precedent, which *Heller* "provide[d] no basis for reconsidering." *Id.* at 352.

McGinnis nevertheless maintains that *Emerson* is not controlling because it did not apply the two-step analytical framework we later adopted in *NRA*, and provided no discussion of the appropriate level of means-end scrutiny. It is true that the *Emerson* court did not expressly implement a two-part inquiry à la *NRA*, yet it was guided by the same concerns. *Emerson* first considered the scope of the Second Amendment right "as historically understood," and then determined—presumably by applying some form of means-end scrutiny *sub silentio*—that § 922(g)(8) is "narrowly tailored" to the

9

goal of minimizing "the threat of lawless violence." *Emerson*, 270 F.3d at 261, 264. It is difficult to see how the result in *Emerson* would be different under the later-developed *NRA* approach.

Be that as it may, in an abundance of caution we proceed to re-analyze the constitutionality of § 922(g)(8) under the two-step *NRA* framework.

### 3.
#### a.

At step one, we examine "whether the conduct at issue falls within the scope of the Second Amendment right." *NRA*, 700 F.3d at 194. We have explained that "a longstanding, presumptively lawful regulatory measure— whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *Id.* at 196.

In this facial challenge, the conduct at issue is the keeping and possessing of firearms by individuals subject to domestic protective orders as defined in § 922(g)(8). McGinnis argues that this conduct, insofar as it includes keeping and possessing firearms at home for self-defense purposes, falls within the scope of the Second Amendment. The Government responds that restricting this conduct harmonizes with historical "limitations on firearms possession by individuals based on the risk they pose to others" and therefore falls outside the Second Amendment's ambit.

We need not and do not resolve this issue. Even assuming *arguendo* that the conduct burdened by § 922(g)(8) falls within the Second Amendment right, McGinnis's facial challenge fails. *Cf. United States v. Mahin*, 668 F.3d 119, 124 (4th Cir. 2012) (assuming *arguendo* that § 922(g)(8) implicates Second Amendment); *see also Mance v. Sessions*, 896 F.3d 699, 704 (5th Cir. 2018) (assuming *arguendo* that statutes prohibiting interstate gun sales are not longstanding or presumptively lawful measures under *NRA* step one).

No. 19-10197

b.

Proceeding to step two, we must "determine whether to apply intermediate or strict scrutiny to the law, and then . . . determine whether the law survives the proper level of scrutiny." *NRA*, 700 F.3d at 194.

i.

"[T]he appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 195. "A law that burdens the core of the Second Amendment guarantee . . . would trigger strict scrutiny, while a less severe law would be proportionately easier to justify." *Id.* at 205 (cleaned up).

Extending his step-one argument, McGinnis maintains that § 922(g)(8) strikes the core of the Second Amendment because it completely disarms individuals subject to qualifying protective orders while offering no exception for home-defense or self-defense. McGinnis therefore urges us to apply strict scrutiny. The Government argues that the Second Amendment, at its core, only protects gun possession by peaceable, responsible citizens, and "any person who falls within § 922(g)(8)'s scope cannot be considered 'peaceable' or 'responsible.'" The Government further points out that § 922(g)(8), like the statute in *NRA* prohibiting 18-to-20-year-olds from buying firearms, disarms only a discrete category, not the entire community. *See NRA*, 700 F.3d at 205. Consequently, the Government says intermediate scrutiny applies. While this is a close question—and while choosing the appropriate level of scrutiny involves some degree of arbitrariness—we agree with the Government.

According to the Supreme Court, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 554 U.S. at 635; *cf. NRA*, 700 F.3d at 206 ("The Second Amendment, at its core, protects law-abiding, *responsible* citizens"

11

(cleaned up)). While § 922(g)(8) is broad in that it prohibits possession of all firearms, even those kept in the home for self-defense, it is nevertheless narrow in that it applies only to a discrete class of individuals for limited periods of time. Critically, the discrete class affected by § 922(g)(8) is comprised of individuals who, after an actual hearing with prior notice and an opportunity to participate, have been found by a state court to pose a "real threat or danger of injury to the protected party." *Emerson*, 270 F.3d at 262.[4] Put differently, individuals subject to such judicial findings are not the "responsible citizens" protected by the core of the Second Amendment. *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012); *cf. United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (stating § 922(g)(8) "prohibit[s] the possession of firearms by [a] narrow class[] of persons who, based on their past behavior, are more likely to engage in domestic violence"). Additionally, the restrictions imposed by § 922(g)(8) apply only for the duration of the protective order.

In sum, intermediate scrutiny applies because § 922(g)(8) is sufficiently bounded both as to "the nature of the conduct being regulated" (it regulates gun possession by persons judicially determined to pose a real threat or danger) and "the degree to which [it] burdens the [Second Amendment] right" (it prohibits possession only after an adversarial hearing and only for the duration of the resulting protective order). *NRA*, 700 F.3d at 195.

---

[4] McGinnis asserts that § 922(g)(8), by its terms, "allow[s] for a criminal conviction against a citizen who is altogether law-abiding and responsible so long as the court order prohibits and restrains certain criminal conduct." Essentially, he takes issue with the fact that § 922(g)(8)'s text does not require a finding that a respondent pose a credible threat. *See* § 922(g)(8)(C)(ii). This argument, however, is foreclosed by *Emerson*, which recognized that Congress enacted § 922(g)(8) "on the assumption" that state laws authorizing protective orders require "evidence credited by the court reflect[ing] a real threat or danger of injury to the protected party by the party enjoined." 270 F.3d at 262; *cf. Mahin*, 668 F.3d at 126 ("[W]hether a finding that the person represents a credible threat is explicit in the order's language or not, it is a necessary step in the court's decision to issue the injunctive order.").

Our analysis in *NRA* supports applying intermediate scrutiny here. In *NRA*, we considered a challenge to statutory provisions "prohibit[ing] federally licensed firearms dealers from selling handguns to persons under the age of 21." 700 F.3d at 188; *see* 18 U.S.C. §§ 922(b)(1) & (c)(1). We determined intermediate scrutiny was "[u]nquestionably" appropriate because the laws did "not disarm an entire community, but instead prohibit[ed] commercial handgun sales to 18-to-20-year-olds—a discrete category." *Id.* at 205. We credited Congress's finding that 18-to-20-year-olds "tend to be relatively irresponsible and can be prone to violent crime, especially when they have easy access to handguns." *Id.* at 206 (quoting Pub. L. No. 90–351, § 901(a)(6), 82 Stat. 197, 226 (1968)). While we were "inclined to uphold the challenged federal laws at step one of our analytical framework," *id.* at 204, we went on to explain that even if the laws burdened the core of the Second Amendment right, the burden was not severe because (1) the laws only affected handgun sales, not use; (2) 18-to-20-year-olds could still purchase long-guns or "acquire handguns from responsible parents or guardians;" and (3) the restrictions were only temporary, ending when a person turns 21. *Id.* at 206–07. Similarly, § 922(g)(8) restricts gun possession for a discrete class and for a limited time. To be sure, § 922(g)(8) works a total ban on gun possession for persons subject to qualifying protective orders, but it does so "against the background of the almost universal rule of American law that for a temporary injunction to issue . . . *[a] presently existing actual threat must be shown.*" *Emerson*, 270 F.3d at 262 (cleaned up). In other words, whereas 18-to-20-year-olds only "tend to be relatively irresponsible," *NRA*, 700 F.3d at 206, individuals subject to the protective orders described in § 922(g)(8) have been adjudged a "real threat." *Emerson*, 270 F.3d at 262. The net result is that neither restriction severely

No. 19-10197

burdens Second Amendment rights and so, under the controlling analysis our circuit has adopted, both call for intermediate scrutiny.[5]

ii.

Having determined intermediate scrutiny applies, we consider whenever § 922(g)(8), on its face, survives. We ask "whether there is a reasonable fit between the law and an important government objective." *NRA*, 700 F.3d at 207. Stated differently, the Government must demonstrate that the statute is "reasonably adapted to an important government interest." *Id.* The parties agree that reducing domestic gun abuse is not just an important government interest, but a compelling one. They only dispute whether § 922(g)(8) is reasonably adapted to that interest. We hold that it is.

As the Fourth Circuit stated, "§ 922(g)(8) rests on an established link between domestic abuse, recidivism, and gun violence and applies to persons already individually adjudged in prior protective orders to pose a future threat of abuse." *Mahin*, 668 F.3d at 128. The statute's procedural requirements, as discussed above, ensure that any predicate protective order was issued only after an adversarial hearing where the respondent was entitled to present his own account of the alleged abuse. Moreover, § 922(g)(8)'s prohibition is temporary, applying only for the duration of the domestic protective order (in McGinnis's case, two years).[6] These features assure us that § 922(g)(8) is

---

[5] We note that each of our sister courts to have reached step two of the post-*Heller* framework has applied intermediate scrutiny to § 922(g)(8). *See Reese*, 627 F.3d at 802; *Chapman*, 666 F.3d at 226; *Mahin*, 668 F.3d at 124.

[6] Congress' tailoring is further revealed by comparing the prohibitions imposed by § 922(g)(8) with those imposed by § 922(g)(9). The former, at issue here, prohibits gun possession only while a court-issued domestic protective order is in effect. The latter, which applies to individuals "convicted in any court of a misdemeanor crime of domestic violence," imposes a lifetime ban on gun possession (or until the conviction is expunged). *See United States v. Skoien*, 614 F.3d 638, 644–45 (7th Cir. 2010).

"reasonably adapted" to the goal of reducing domestic gun abuse, whether or not it is the least restrictive means for doing so.

This conclusion is supported, if not dictated, by our holding in *Emerson*. There we found a sufficient "nexus" between "the threat of lawless violence" and § 922(g)(8)'s prohibition on gun possession for persons subject to domestic protective orders—even orders lacking express judicial findings of future danger. *Emerson*, 270 F.3d at 264. That is, we concluded § 922(g)(8) was one of the "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individual keep and bear their private arms as historically understood in this country." *Id.* at 261. At a minimum, *Emerson* applied heightened—i.e., intermediate—scrutiny, and some have suggested it applied strict scrutiny. *See, e.g.*, *United States v. Elkins*, 780 F. Supp. 2d 473, 478 (W.D. Va. 2011) (describing *Emerson* as applying "strict scrutiny"). Regardless, we see no reason to depart from *Emerson*'s means-end analysis in this case.

In sum, we hold § 922(g)(8) passes constitutional muster under our two-step *NRA* framework and therefore reject McGinnis's facial challenge. We note, however, that our holding today does not foreclose the possibility of a successful as-applied challenge to § 922(g)(8). *See, e.g.*, *City of El Cenzio v. Texas*, 890 F.3d 164, 191 (5th Cir. 2018) (post-enforcement "as-applied challenges . . . are the basic building blocks of constitutional adjudication" (cleaned up)).

### B.

Next, we consider McGinnis's claim that his conviction must be reversed because the language of the underlying domestic protective order fails to satisfy the conditions of § 922(g)(8)(C)(i) or (C)(ii). Since McGinnis raised this sufficiency-of-the-evidence claim in a Rule 29 motion at trial, our review is *de novo* yet "highly deferential to the verdict." *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Beacham*, 774 F.3d 267, 272

(5th Cir. 2014)). We must affirm as long as "a reasonable jury could conclude that the evidence presented, viewed in the light most favorable to the government, established the defendant's guilt beyond a reasonable doubt." *United States v. Buluc*, 930 F.3d 383, 387 (5th Cir. 2019) (quoting *United States v. Duncan*, 164 F.3d 239, 242 (5th Cir. 1999)).

As noted above, § 922(g)(8) contains three elements, the third of which may be satisfied in the alternative. Subsections (C)(i) and (C)(ii) require that the underlying protective order either:

> (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

The protective order in this case included a finding "that family violence has occurred and that family violence is likely to occur in the foreseeable future." The order also prohibited McGinnis from (1) "committing family violence against" Sherry Thrash; (2) "communicating directly with [Thrash] in a threatening or harassing manner"; (3) "[c]ommunicating a threat through any person to" Thrash; or (4) "[e]ngaging in conduct directed specifically toward" Thrash "that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" her.

McGinnis contends there was insufficient evidence to support his conviction because his protective order meets neither of the requirements in § 922(g)(8)(C). He argues the order is inadequate under (C)(i) because it does not incorporate a finding that McGinnis "represents a credible threat" to Thrash's "physical safety." He relies on the fact that Texas's statutory definition of "family violence" includes assault, an offense that does not necessarily involve the threat of physical harm. *See* TEX. FAM. CODE § 71.004; TEX. PENAL CODE § 22.01(a). Essentially, McGinnis's position is that if a state's

definition of family violence includes any conduct that does not "represent[] a credible threat to . . . physical safety," then a state court's generalized finding of family violence cannot support a federal conviction under § 922(g)(8)(C)(i).

As to § 922(g)(8)(C)(ii), McGinnis argues that the language in his protective order is not "substantially similar" to the statutory language as mandated by (C)(ii)'s requirement that the order "*by its terms explicitly* prohibit[] the use, attempted use, or threatened use of physical force . . ." (emphasis added). McGinnis invokes the surplusage canon of statutory interpretation to argue that Congress would not have included the phrase "by its terms explicitly" if Congress did not wish to impose a literal requirement that any qualifying protective order clearly and without implication prohibit the use, attempted use, or threatened use of physical force. He also cites the legislative history of § 922(g)(8), arguing the language of (C)(ii) was intended to satisfy "more conservative" House members by keeping the statute narrow.

We find McGinnis's arguments unavailing, and hold that, at the very least, the protective order at issue satisfies the requirements of subsection (C)(ii). As McGinnis himself observes, other courts of appeals have squarely held that similar or even broader language suffices under (C)(ii). For example, the Fourth Circuit has held that a protective order requiring its subject to "refrain from abusing" his wife "unambiguously satisfies subsection (C)(ii)'s requirement that the court order prohibit the use, attempted use, or threatened use of physical force." *United States v. Bostic*, 168 F.3d 718, 722 (4th Cir. 1999). Similarly, the First Circuit held that a protective order prohibiting its subject from "abusing, harassing, or threatening his wife or children" was sufficient under (C)(ii) even though it "d[id] not use the same verbiage as the statute." *United States v. Coccia*, 446 F.3d 233, 235, 241 (1st Cir. 2006). The court took a common-sense approach, recognizing that "the commonly understood definition of 'abuse' includes violent acts involving

17

physical force within the [statutory] definition." *Id.* at 242. The Eleventh Circuit reached the same conclusion as to a protective order enjoining its subject from "intimidating, threatening, hurting, harassing, or in any way putting the plaintiff, . . . her daughters and/or her attorney in fear of their lives, health, or safety." *United States v. DuBose*, 598 F.3d 726, 731 (11th Cir. 2010) (per curiam). The court reasoned that because "the definition of 'hurt' as a verb includes 'to inflict with physical pain,' . . . the order's language restraining [the subject] from 'hurting' his wife . . . satisfies subsection (C)(ii)'s requirement." *Id.* (cleaned up). The court added that "[a] narrower interpretation would defeat what we conceive to be the obvious and general purpose of the statute." *Id.*

Consistent with these cases, we hold that if the commonly understood definitions of terms in the protective order include acts involving "physical force," the protective order is sufficient to support a conviction under § 922(g)(8)(C)(ii). Here, McGinnis's protective order prohibited him from "[c]omitting family violence" against Thrash or engaging in conduct likely to "abuse" her. The commonly understood definitions of these terms include acts involving physical force. Thus, the jury plausibly found that the order satisfied (C)(ii), and so we decline to reverse McGinnis's conviction on this basis.[7]

## C.

Finally, we address McGinnis's contention that the district court erred by including a condition of supervised release in its written judgement—namely, restraining McGinnis from visiting "places frequented by Ms. Sherry Thrash"—that the court did not pronounce orally at sentencing. Our standard of review for oral-pronouncement claims varies depending on whether the

---

[7] Because we hold that McGinnis's underlying protective order satisfies § 922(g)(8)(C)(ii), we need not and do not reach the question whether it also satisfies (C)(i).

defendant had opportunity to object. If he had no such opportunity, we review for abuse of discretion. *United States v. Mudd*, 685 F.3d 473, 480 (5th Cir. 2012). If the defendant had opportunity but failed to object, we review for plain error. *United States v. Huor*, 852 F.3d 392, 398 (5th Cir. 2017).

The district court's obligation to orally pronounce its sentence is grounded in the defendant's right to be present at sentencing, which in turn is derived from the Sixth Amendment and the Due Process Clause. *See United States v. Morin*, 832 F.3d 513, 519 (5th Cir. 2016); *United States v. Bigelow*, 462 F.3d 378, 381 (5th Cir. 2006). "[W]hen there is a conflict between a written sentence and an oral pronouncement, the oral pronouncement controls." *United States v. Martinez*, 250 F.3d 941, 942 (5th Cir. 2001). In such cases, the written judgment must be returned to the district court and "reformed to conform to the oral sentence." *Huor*, 852 F.3d at 404. If the difference between the orally pronounced sentence and the written judgment "is only an ambiguity," however, "we look to the sentencing court's intent to determine the sentence." *Bigelow*, 462 F.3d at 381.

At sentencing, the district court orally granted the Government's request to impose a special condition barring McGinnis from having "any direct or indirect contact with Ms. Thrash during [his] term of supervised release." McGinnis did not object to this condition. However, the language appearing on McGinnis's written judgment provides not only that McGinnis may not contact Thrash but also that he "shall not enter onto the premises, travel passed [sic], or loiter near Ms. Sherry Thrash's residence, place of employment, or other places frequented by Ms. Sherry Thrash."

McGinnis argues that the condition in his written judgment prohibiting him from entering or traveling past "other places frequented by Ms. Sherry Thrash" directly conflicts with the district court's oral pronouncement. Further, because he "could not have objected to the [later-added language] at

sentencing," McGinnis submits that the conflict should be reviewed for abuse of discretion rather than plain error. The Government concedes this issue, offering no objection "to a remand for the limited purpose of allowing the district court to delete that short phrase from the rest of the condition."

Because McGinnis received no notice of the extra terms included in his written judgment, we review for abuse of discretion. *Mudd*, 685 F.3d at 480. McGinnis is correct that by imposing "a more burdensome requirement" than the special condition recited at sentencing, his written judgment creates a conflict with the court's oral pronouncement, not merely an ambiguity. *Bigelow*, 462 F.3d at 383. Thus, as the Government acknowledges, McGinnis's judgment must be returned to the district court and "reformed to conform to the oral sentence." *Huor*, 852 F.3d at 404.

\* \* \*

For the foregoing reasons, we AFFIRM McGinnis's conviction but REMAND for the limited purpose of amending McGinnis's written judgment to conform to the district court's oral pronouncement at sentencing.

STUART KYLE DUNCAN, Circuit Judge, joined by EDITH H. JONES, Circuit Judge, concurring:

While our opinion today dutifully applies our court's two-step framework for post-Heller Second Amendment challenges, I write separately to reiterate the view that we should retire this framework in favor of an approach focused on the Second Amendment's text and history.[1]  Not only would this approach provide firmer ground for evaluating restrictions on the right to bear arms, but it would also further cabin judicial application of the "tiers-of-scrutiny approach to constitutional adjudication," an exercise which "is increasingly a meaningless formalism." Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2326–27 (2016) (Thomas, J., dissenting).[2]  "[W]hatever abstract tests [courts] may choose to devise, they cannot supersede . . . those constant and unbroken national traditions that embody the people's understanding" of constitutional guarantees. United States v. Virginia, 518 U.S. 515, 568 (1996)

---

[1] See Mance v. Sessions, 896 F.3d 390, 394–95 (5th Cir. 2018) (en banc) (mem.) (Elrod, J., dissenting from denial of en banc rehearing, joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ.) ("Simply put, unless the Supreme Court instructs us otherwise, we should apply a test rooted in the Second Amendment's text and history—as required under Heller and McDonald—rather than a balancing test like strict or intermediate scrutiny."); see also Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 338 (5th Cir. 2013) (Jones, J., dissenting) ("[W]e should presuppose"—based on Heller's analogy to First Amendment rights—"that the fundamental right to keep and bear arms is not itself subject to interest balancing."); Heller v. Dist. Of Columbia [Heller II], 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my view, Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").

[2] United States v. Virginia, 518 U.S. 515, 567 (1996) (Scalia, J., dissenting) ("These [tiers of scrutiny] are no more scientific than their names suggest, and a further element of randomness is added by the fact that it is largely up to us which test will be applied in each case."); see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. REV. 1443, 1464–70 (2009) (arguing the intermediate/strict scrutiny distinction is less helpful in Second Amendment cases than might appear).

No. 19-10197

(Scalia, J., dissenting). I would support en banc review in this case or any appropriate future case to reassess our Second Amendment analysis.